1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

ELSIE CAYANAN, *et al.*,

NO. 12-CV-1476-MMA(JMA)

11

Plaintiffs,

12

vs.

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION**

13

CITI HOLDINGS, INC., *et al.*,

[Doc. No. 16]

14

Defendants.

15

16        Plaintiffs Elsie Cayanan, Kimberly Baker, and Jesse McKay bring this

17  putative class action for alleged violations of the Telephone Consumer Protection

18  Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.*  Defendants Citibank, N.A.; Citigroup, Inc.;

19  and CitiFinancial Services, Inc., move to compel arbitration of Plaintiffs' claims in

20  separate, individual arbitrations, in accordance with agreements requiring individual

21  arbitration of all claims related to Plaintiffs' consumer credit accounts held by

22  Defendants.  The Court finds this matter suitable for decision on the papers and

23  without oral argument pursuant to Civil Local Rule 7.1.d.1.  For the reasons set forth

24  below, the Court **GRANTS** Defendants' motion.

25  / / /

26  / / /

27  / / /

28  / / /

# I. BACKGROUND

**A.    Plaintiff Elsie Cayanan**

Plaintiff Cayanan, a resident of California, obtained two personal loans from CitiFinancial.  First, on March 7, 2007, Cayanan borrowed $5,353.34, and in the process signed two documents entitled "Disclosure Statement, Note and Security Agreement" (the "2007 Note") and "Arbitration Agreement."  [Baer Decl., Doc. No. 16-2 at ¶ 3; Baer Suppl. Decl., Doc. No. 26-1 at ¶ 2.]  Then, on January 15, 2008, Cayanan borrowed another $5,045.38 from CitiFinancial and again signed new "Disclosure Statement, Note and Security Agreement" (the "2008 Note") and "Arbitration Agreement" documents.  [Baer Decl. at ¶ 69; Baer Suppl. Decl. at ¶ 3.]  Both the 2007 Note and 2008 Note contained the following language above their signature blocks:  "**ARBITRATION.**  Borrower . . . and Lender have entered into a separate Arbitration Agreement on this date, the terms of which are incorporated and made a part of this Disclosure Statement, Note and Security Agreement by this reference."  [Exs. 1, 3 to Baer Decl., Doc. No. 16-3 at 5, 12 (formatting in original).][1]  The two arbitration agreements that bear Cayanan's signatures both contain the following language:

> **THIS ARBITRATION AGREEMENT PROVIDES THAT ALL DISPUTES BETWEEN BORROWER AND CERTAIN OTHER PERSONS ON THE ONE HAND AND LENDER AND CERTAIN OTHER PERSONS AND ENTITIES ON THE OTHER HAND, EXCEPT THOSE SPECIFIED BELOW, WILL BE RESOLVED BY MANDATORY, BINDING ARBITRATION. YOU THUS GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS (EXCEPT FOR MATTERS THAT ARE EXCLUDED FROM ARBITRATION AS SPECIFIED BELOW). YOUR RIGHTS WILL BE DETERMINED BY A NEUTRAL ARBITRATOR AND NOT A JUDGE OR JURY.  YOU ARE ENTITLED TO A FAIR HEARING, BUT THE ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.**
>
> . . . .

---

[1]  All citations to documents filed on the Court's docket refer to the documents' renumbered CM/ECF page numbers, not to the documents' native pagination.

"Claim" means any case, controversy, dispute, tort, disagreement, lawsuit, or claim now or hereafter existing between You and Us.  A Claim includes, without limitation, anything related to:
• The Note, this Agreement, or the enforceability, or the arbitrability of any Claim pursuant to this Agreement, including but not limited to the scope of this Agreement and any defenses to enforcement of the Note or this Agreement;
• Any Credit Transaction;
• Any past, present, or future insurance, service, or other product that is offered or purchased in connection with a Credit Transaction;
• Any documents or instruments that contain information about any Credit Transaction, insurance, Service, or product;
• Any act or omission by any of Us;
• Fraud or misrepresentation, including claims for failing to disclose material facts;
• Any federal or state statute or regulation, or any alleged violation thereof, including without limitation insurance, usury, and lending laws;
• Any party's execution of this Agreement and/or willingness to be bound by its terms and provisions; or
• Any dispute about closing, servicing, collecting, or enforcing a Credit Transaction.

. . . .

No Class Actions/No Joinder of Parties.  You agree that any arbitration proceeding will only consider Your Claims.  Claims by or on behalf of other borrowers will not be arbitrated in any proceeding that is considering Your or Our Claims.  Because You have agreed to arbitrate all Claims, You may not serve as a class representative or participate as a class member in a putative class action against any party entitled to compel arbitration under this Agreement.

[Exs. 2, 4 to Baer Decl., Doc. No. 16-3 at 7, 14 (formatting in original).]

As of April 15, 2012, Cayanan was "delinquent in her monthly payments to CitiFinancial," and, as a result, CitiFinancial began "placing collection calls to Cayanan to attempt to collect the debt" from April 16, 2012, to June 19, 2012.  [Baer Suppl. Decl. at ¶¶ 4-5.]  In addition to these calls in 2012, Cayanan recalls receiving collection calls in 2008, when she had lost her employment, "struggled to keep paying on the loan," and missed one or more payments.  [Cayanan Suppl. Decl., Doc. No. 27-1 at ¶ 6.]  Cayanan recounts that she received numerous telephone calls in 2008 and 2012–several on the same day, sometimes in rapid succession, and at all hours of the day.  [*Id.* ¶¶ 6, 10.]  From April through June 2012, Cayanan received at least 116 collection calls.  [*Id.* ¶ 5.]

**B.      Plaintiff Kimberly Baker**

Plaintiff Baker, also a California resident, has maintained three credit card accounts serviced by Citibank.  In 1997, Baker applied for and obtained a "GTE" brand credit card.  [Baker Decl., Doc. No. 27-4 at ¶ 3.]  It is unclear whether the GTE card application process involved execution of an arbitration agreement.  [*Id.* ¶ 6.]  In 2000, Citibank began servicing Baker's GTE card account and eventually converted it to a Citibank Thank You credit card (the "Thank You Card").  [*Id.* ¶ 8.]

In the years after Citibank began servicing the Thank You Card, Citibank periodically mailed Baker several change-of-terms notices–to which Baker refers as "bill stuffers"–that informed her of various changes to her account.  The first notice was sent in April 2003 and included a complete cardmember agreement.  [Barnette Decl., Doc. No. 16-6 at ¶ 7.]  The notice informed Baker that Citibank intended to change the terms of her cardmember agreement and indicated that the enclosed cardmember agreement would replace any existing agreement beginning in late May 2003.  [*Id.* ¶ 8.]  The notice provided that Baker could notify Citibank in writing of her intent not to be bound by the new cardmember agreement, that doing so would result in the closure of her account, and that she could pay off her "account under the existing terms" after the account closure.  [Ex. 1 to Barnette Decl., Doc. No. 16-7 at 3.]  The cardmember agreement that accompanied the notice contained the following arbitration clause:

> **ARBITRATION:**
> **PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.  IT PROVIDES THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION.  ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.  IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY.  ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES.**
>
> **Agreement to Arbitrate:**
> Either you or we may, without the other's consent, elect mandatory,

binding arbitration for any claim, dispute, or controversy between you and us (called "Claims").

**Claims Covered:**
**What Claims are subject to arbitration?**  All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision.  All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek.  This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims.  A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party.  Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, nonrepresentative) basis, and the arbitrator may award relief only on an individual (nonclass, non-representative) basis.

. . . .

**Broadest Interpretation.**  Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.  This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

[*Id.* at 14-15 (formatting in original).]  Citibank does not have a record that Baker notified Citibank of her intent not to be bound by the new cardmember agreement or that the April 2003 notice was returned as undeliverable.  [Barnette Decl. at ¶ 9.] Baker continued to use the Thank You Card as evidenced by a credit card statement dated May 17, 2004–more than a year after the notice was sent.  [Ex. 3 to Barnette Decl., Doc. No. 16-7 at 21.]  Thereafter, Citibank mailed Baker complete cardmember agreements on at least three more occasions:  in April 2007 in connection with a conversion to a Citi Diamond Preferred Rewards American Express credit card (Barnette Decl. at ¶¶ 16-17; Exs. 6, 7); in May 2009 in connection with a change in pricing (*id.* ¶¶ 19-20; Exs. 9, 10); and in April 2011 in connection with a final conversion to the Thank You card (*id.* ¶¶ 22-23; Exs. 12, 13). After each time Citibank sent Baker the notices, complete cardmember agreements,

and arbitration agreement above, she continued to use the Thank You Card account as evidenced by billing statements that include charges made to the account.  [*Id.* ¶¶ 18, 21, 24; Exs. 8, 11, 14.]

In addition to the Thank You Card, Baker also used two other charge cards serviced by Citibank:  a Sears MasterCard ("Sears Card I") and a Sears Home Improvement Card ("Sears Card II").  [Barnette Suppl. Decl., Doc. No. 26-3 at ¶ 2.]  Baker applied for Sears Card I in March 2008, and Citibank sent her a cardmember agreement that included an arbitration agreement "when she opened" the account.  [Barnett Decl. at ¶¶ 30-31.]  Baker used the Sears Card I from April 2008 to February 2009.  [*Id.* ¶ 32.]  Subsequently, Baker applied for the Sears Card II account in September 2010, and Citibank sent her a cardmember and arbitration agreement "when [the account] was opened."  [*Id.* ¶¶ 26-27.]  Unlike with the Thank You Card account, however, Citibank does not provide any additional details about supplemental cardmember agreements, opt out opportunities, or whether Baker was informed of the arbitration agreement at the time she applied for the Sears Card I and Sears Card II accounts.

In late 2011, Baker began receiving numerous telephone calls on both her cellular telephone and land-based home telephone.  [Baker Decl. at ¶ 10.]  Prior to this time, Baker's Thank You Card account had become delinquent, and Defendants began calling her in order to "collect" on the account.  [Barnette Suppl. Decl. at ¶ 3.]  Baker subsequently became delinquent on the Sears Card I and Sears Card II accounts in early 2012, and Defendants continued calling her to collect on these accounts in addition to the Thank You Card account.  [*Id.*]  She received these calls sometimes in rapid succession, as early as 8:00 a.m., and as late as 10:00 p.m.  [Baker Decl. at ¶ 11.]

**C.     Plaintiff Jesse McKay**

On August 20, 2008, Plaintiff McKay, a resident of Connecticut, completed and submitted an electronic application for a $12,000 student loan using Citibank's internet website.  [McKay Decl., Doc. No. 27-3 at ¶ 3; House Suppl. Decl., Doc. No. 26-2 at ¶ 2.]  The signature box of the electronic application included the following language:

> **Please read your enclosed Promissory Note in its entirety before signing this section.** . . . .  **Promise to pay:**  I promise to pay Citibank, N.A. or any other holder of the accompanying promissory note (the "Note") all sums disbursed under the terms of this application (the "Loan") plus interest, fees and other charges which may have become due as provided by the Note.  The terms and conditions of this application, the Note, any Conditional Approval Letter and any other disclosures collectively constitute the entire agreement between you and me. . . . .

[Ex. 1 to House Decl., Doc. No. 16-5 at 3 (formatting in original).]  However, before McKay could affix his electronic signature to this section of the loan application, he was required to view, among other things, a Promissory Note that included the following arbitration clause:

> ARBITRATION OF DISPUTES
> PLEASE READ THIS ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT EITHER YOU OR I CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARBITRATION (EXCEPT FOR MATTERS THAT ARE EXCLUDED FROM ARBITRATION AS SPECIFIED BELOW). ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.  IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY.  ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.
>
> . . . .
>
> **Agreement to Arbitrate:**
> You and I agree that either you or I may, without the other's consent, require that Claims between you and me be submitted to mandatory, binding arbitration except for certain matters excluded below.  This arbitration provision is made pursuant to a transaction involving interstate commerce, and shall be governed by, and enforceable under, the Federal Arbitration Act (the "FAA"), 9 U.S.C. §1 et seq., and (to the extent State law is applicable), the State law governing this

transaction.

**Claims subject to Arbitration include, but are not limited to:**
• Claims relating to: 1) any and all aspects of my Account including without limitation the origination, establishment, terms, treatment, operation, handling, billing, servicing, limitations on or termination or acceleration of my Account; 2) any disclosures or statements relating to my Account; 3) the application, enforceability or interpretation of my Account, including this arbitration provision.  Any questions about what Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

. . . .

• Claims based on any theory of law, any contract, statute, regulation, ordinance, tort (including fraud or any intentional tort), common law, constitutional provision, respondeat superior, agency or other doctrine concerning liability for other persons, custom or course of dealing or any other legal or equitable ground (including any claim for injunctive or declaratory relief).

. . . .

• Claims made as part of a class action or other representative action, and the arbitration of such Claims must proceed on an individual (non-class, nonrepresentative) basis. If you or I require arbitration of a particular Claim, neither you, me, nor any other person may pursue the Claim in any litigation, whether as a class action, private attorney general action, other representative action or otherwise.

. . . .

**No consolidation or joinder of parties:**

All parties to the arbitration must be individually named. Claims by persons other than individually named parties shall not be raised or determined. Notwithstanding anything else that may be in this arbitration provision, no class action, private attorney general action or other representative action may be pursued in arbitration, nor may such action be pursued in court if any party has elected arbitration. Unless consented to by all parties to the arbitration, Claims of two or more persons may not be joined, consolidated or otherwise brought together in the same arbitration (unless those persons are applicants, co-applicants on a single Account and/or related Accounts or parties to a single transaction or related transactions); this is so whether or not the Claims (or any interest in the Claims) may have been assigned.

[Ex. 5 to House Decl. at 18-19.]  As Timothy House, a Citibank Senior Vice

President, explains in his declaration, "[c]onsumers who failed to access [the

Promissory Note] received an error message notifying them of their failure to

complete the required step(s) and preventing them from completing the application." [*Id.* ¶ 4.]  Once McKay viewed the Promissory Note, it was available to him to print in electronic Portable Document Format ("PDF").  [*See* Ex. 2 to House Decl.] Citibank's computer system recorded that McKay viewed the Promissory Note on August 20, 2008, at 10:33:37 a.m. EST, and electronically signed the loan application on August 20, 2008, at 10:33:44 a.m. EST.  [*Id.* ¶ 8; Ex. 4.]

McKay's student loan entered repayment in 2009 and is currently in default. [House Suppl. Decl. at ¶¶ 3, 5.]  With respect to Citbank's contacts with McKay, Citibank explains that, "[i]n May 2010, Citibank contacted McKay twice by telephone regarding repayment of his loan" and had previously "sent McKay several letters regarding repayment options, and also had called to verify his correct address and email address."  [*Id.* ¶ 3.]  Citibank further explains that, "[f]rom July 2010 through August 2010, McKay and Citibank discussed the possible forebearance of his loan" and "[f]rom December 2010 through July 2011,  . . . [they] further discussed hardship and repayment options on the loan."  [*Id.* ¶ 4.]  However, McKay avers he received many more prerecorded calls–up to 10 to 12 times per day, sometimes in rapid succession, and at "all hours of the day."  [McKay Decl. at ¶ 7.]

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement."  9 U.S.C. § 4.  Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration.  *Id.*  If such a showing is made, the district court shall also stay the proceedings pending resolution of the arbitration at the request of one of the parties bound to arbitrate.  *Id.* § 3.

12CV1476

The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements.  *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740, 1745-46 (2011).  Federal courts are required to rigorously enforce an agreement to arbitrate.  *See id.*  Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476-77 (1989).

In determining whether to issue an order compelling arbitration, the Court may not review the merits of the dispute and must limit its inquiry to (1) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce,[2] (2) whether there exists a valid agreement to arbitrate, and (3) whether the dispute falls within the scope of the agreement to arbitrate.  *See Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 477-78 (9th Cir. 1991).  If the answer to each of these queries is in the affirmative, then the Court must order the parties to arbitration in accordance with the terms of their agreement.  *See* 9 U.S.C. § 4.  If there is a genuine dispute of material fact as to any of these queries, a district court should apply a "standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]."  *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

The foregoing notwithstanding, the strong presumption in favor of arbitration "does not confer a right to compel arbitration of any dispute at any time."  *Volt Info. Scis., Inc.*, 489 U.S. at 474.  The FAA provides that arbitration agreements are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" federal law.  *Doctor's Assocs., Inc. v. Casarotto*,

---

[2] The parties do not dispute whether the loans and credit agreements evidence a transaction involving interstate commerce.

517 U.S. 681, 687 (1996).  This is because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  Accordingly, the Court reviews Plaintiffs' arbitration agreements in light of the "liberal federal policy favoring arbitration," *Concepcion*, 131 S. Ct. at 1745, and considers the enforceability according to the laws of the state of contract formation.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Ingle v. Circuit City Stores*, 328 F.3d 1165, 1170 (9th Cir. 2003).

### III.  DISCUSSION

#### A.    Whether Enforceable Arbitration Agreements Exist

The Court's first inquiry is whether each named Plaintiff entered into an arbitration agreement with Defendants.  This inquiry necessarily requires the Court to discuss the enforceability of each agreement under the rubric of the applicable state's contract law.  Here, because either California, South Dakota, or Nevada law could govern one or more of Plaintiffs' agreements, the Court first conducts a choice-of-law analysis for each Plaintiff's agreement and then proceeds to analyze the enforceability of each agreement under the applicable state law.

##### 1.    Choice of Law

"Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply.  It makes this determination using the choice-of-law rules of the forum state . . . ."  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)).  Therefore, since Plaintiffs brought this lawsuit in California, the Court applies California's choice of law rules to determine whether to apply California, South Dakota (for Baker), or Nevada (for McKay) law.  *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010).

1    "When an agreement contains a choice of law provision, California courts

2    apply the parties' choice of law unless the analytical approach articulated in § 187(2)

3    of the Restatement (Second) of Conflict of Laws . . . dictates a different result." *Id.*

4    (quoting *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per

5    curiam)).  "Under the Restatement approach, the court must first determine 'whether

6    the chosen state has a substantial relationship to the parties or their transaction, . . .

7    or whether there is any other reasonable basis for the parties' choice of law.'" *Id.*

8    (quoting *Nedlloyd Lines B.V. v. Sup. Ct.*, 834 P.2d 1148, 1152 (Cal. 1992).  "If . . .

9    either test is met, the court must next determine whether the chosen state's law is

10   contrary to a fundamental policy of California." *Id.* (same).  "If the court finds such

11   a conflict, it 'must then determine whether California has a 'materially greater

12   interest than the chosen state in the determination of the particular issue.'" *Id.*

13   (same).  "If California possesses the materially greater interest, the court applies

14   California law despite the choice of law clause." *Id.* at 1002-03.

15       Here, the Court applies California law in its analysis of Cayanan's arbitration

16   agreements, as Cayanan is a California resident, whose two personal loans were

17   obtained in California from a CitiFinancial branch located in California, and because

18   the two arbitration agreements' choice of law provisions designate "federal law and .

19   . . the laws of the state where the closing of the Credit Transaction took place . . . ."

20   [Doc. No. 16-3 at 8, 15.]  However, the parties have offered scant guidance on which

21   state law the Court should apply to McKay's and Baker's agreements.[3]  For the

22   reasons stated below, the Court applies South Dakota law to Baker's agreements and

23   Nevada law to McKay's agreement.

24

25   _____

26   [3] Defendants cite several cases that simply conclude, without any or much analysis, that a
     particular state's law applies pursuant to the arbitration agreements' designation.  However, as the
     Ninth Circuit Court of Appeals has expressly instructed, the Court must engage in the choice of

27   law analysis set forth in *Nedlloyd Lines B.V. v. Sup. Ct.*, 834 P.2d 1148, 1153 (Cal. 1992), with
     respect to the particular facts of each individual case.  *Hoffman v. Citibank, N.A.*, 546 F.3d 1078,

28   1082-83 (9th Cir. 2008).

1

### 2.   Plaintiff McKay's Arbitration Agreement

2

#### a.   Choice of Law:  Nevada Law Applies

3      As explained above, the Court first applies California's choice of law rubric to

4  the Nevada law designation in McKay's arbitration agreement.  In the first step, the

5  Court determines whether the chosen state–Nevada–has a "substantial relationship"

6  with Citibank or McKay.  The Court first finds that Nevada does not have a

7  substantial relationship with McKay because he applied for the student loan in

8  Connecticut, where he resided at the time, and he intended to use the loan to attend

9  the University of Hartford-West Hartford, which is also located in Connecticut.  The

10  Court next finds that Nevada does not have a substantial relationship with Citibank.

11  The Court so concludes because "[t]he 'substantial relation' and 'reasonable basis'

12  language come from the application of Restatement (Second) of Conflict of Laws §

13  187(2) (1971)," *Consul, Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1147 (9th Cir.

14  1986), which provides that a substantial relation exists when "[the chosen] state is

15  . . . where one of the parties is domiciled or has his principal place of business,"

16  Restatement (Second) of Conflict of Laws § 187 comment f; *accord Nedlloyd Lines*

17  *B.V. v. Sup. Ct.*, 834 P.2d 1148, 1153 (Cal. 1992).  Here, Citibank is not "domiciled"

18  in Nevada within the meaning of the Restatement because, according to the Nevada

19  Secretary of State, Citibank is not incorporated in Nevada.  *See* Restatement

20  (Second) of Conflict of Laws § 11 comment l to Subsection (1) ("When a domicil is

21  assigned to a corporation, it is always the state of incorporation.").  Furthermore,

22  Nevada is not Citibank's "commercial domicil" because its main office and principle

23  place of business are in New York or South Dakota.  *See id.* ("As stated in Comment

24  i, the term 'commercial domicil' is sometimes used to designate a state where a

25  corporation, although incorporated elsewhere, maintains its main office and

26  principal place of business.").

27

28

In the alternative prong of the first step, Nevada law may still apply if a "reasonable basis" exists to designate Nevada law.  Based on persuasive and analogous caselaw, the Court concludes that Citibank had a reasonable basis to designate Nevada law in the type of loan for which McKay applied.  The California Court of Appeal recently found that a reasonable basis existed for the designation of Washington state law in a franchise agreement where the franchisor was headquartered in Canada and the franchisee was a California resident.  *1-800-Got Junk? LLC v. Sup. Ct.*, 116 Cal. Rptr. 3d 923, 933 (Cal. Ct. App. 2010) ("*Got Junk*").[4]  The Court of Appeal held a franchisor could designate "a single state law to apply to all of its franchise agreements," because "there is a benefit to a franchisor and a franchisee system in having a single set of rules apply to all franchisees . . . ." *Id.*  The Court of Appeal favorably cited *Capital National Bank of New York v. McDonald's Corp.*, 625 F. Supp. 874 (S.D.N.Y. 1986), in which the court reached a similar result where McDonald's Corporation entered a "substantial number of franchise agreement in various states . . . [and had] an interest in having those agreements governed by one body of law."  *Id.* (quoting *McDonald's Corp.*, 625 F. Supp. at 880).  The Court finds that McKay's student loan agreement in this case is analogous to the franchise agreements in *McDonald's Corp.* and *Got Junk*.  The Court so concludes because Citibank maintains a wide reach across the United States based on the large number of student loan transactions the company has entered in the past.[5]  Based on the analogous facts in *McDonald's Corp.* and *Got Junk*, the

---

[4]  The Court notes that it was undisputed in this case that no substantial relationship existed between any of the parties and Washington state.  *Id.* at 932.  The Court of Appeal's discussion thus centered on the "alternative prong of the test":  whether a reasonable basis existed to designate Washington state law.  *Id.*

[5]  Pursuant to Federal Rule of Evidence 201(b)(2), the Court takes judicial notice of the facts in this footnote.  In 2010 and 2011, Citibank sold several billion dollars of its student loan portfolio to Discovery Financial Services.  Discover Fin. Servs., Current Report (Form 8-K) (Jan. 3, 2011), *available at* http://www.sec.gov/Archives/edgar/data/1393612/000119312511 000144/d8k.htm; Discover Fin. Servs., Current Report (Form 8-K) (Sept. 1, 2011), *available at* http://www.sec.gov/Archives/edgar/data/1393612/00011931 2511238569/d8k.htm.  Under the

1  Court concludes that a reasonable basis exists for Citibank's designation of Nevada

2  law in its arbitration agreement with McKay.

3       The second step of the Court's inquiry requires determination of whether

4  Nevada's law is contrary to fundamental policy of California. As will become

5  evident below, because Nevada law does not conflict with California policy, this

6  inquiry is not necessary, and the Court consequently applies Nevada law to the

7  McKay arbitration agreement.

8                    **b.      McKay Agreed to Arbitration**

9       Plaintiffs first argue that McKay never knowingly agreed to arbitrate any

10 claims with Citibank. McKay avers he did not agree to arbitration when he applied

11 for his student loan because he did not sign or receive an arbitration agreement and

12 did not sign the actual document in which the arbitration agreement appears.[6]

13      The evidence before the Court establishes that McKay could not electronically

14 sign the student loan application without first viewing the Promissory Note, which

15 included a prominent arbitration agreement. Moreover, the Promissory Note was

16 available to McKay in PDF format, which he could have printed had he wished to do

17 so. Finally, Citibank's records establish that McKay in fact viewed the Promissory

18 Note PDF file before he electronically signed his loan application. Under these

19 facts, McKay expressly assented to the arbitration agreement when he signed the

20 loan application that expressly incorporated the Promissory Note. *Scaffidi v. United*

21 _____

22 agreement, Citibank would "continue to service the loans for a transitional period after closing."
   Current Report (Form 8-K) (Sept. 1, 2011). Also, in September 2010, Citibank sold $28 billion of
23 "securitized federal student loans and related assets" to Sallie Mae. SLM Corp., Quarterly Report
   (Form 10-Q) (Nov. 8, 2010) at p.63, *available at* http://www.sec.gov/Archives/edgar/data/
24 1032033/000095012310102526/w79858e10vq.htm. The sheer dollar amount of Citibank's former
   student loan portfolio demonstrates the wide-ranging scale of the company's student loan lending
25 activities.

26      [6] Although Plaintiffs assert McKay is not bound by "bill stuffer" notices, there is no
   evidence that Defendants ever sent McKay any bill stuffer notices. In any event, Defendants do
27 not rely on any bill stuffer notices as the basis for McKay's agreement arbitrate. Rather, they rely
   solely on the arbitration agreement incorporated by reference in McKay's student loan application
28 at the time he applied for the loan.

*Nissan*, 425 F. Supp. 2d 1159, 1167 (D. Nev. 2005) ("Nevada follows the general rule that 'writings which are made part of the contract by annexation or reference will be so construed; but where the reference to another document is made for a particular and specified purpose such a writing becomes a part for such specified purpose only.'") (quoting *Lincoln Welding Works v. Ramirez*, 647 P.2d 381, 383 (Nev. 1982)); *accord Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 610 (Cal. Ct. App. 2009) ("A contract may validly include the provisions of a document not physically a part of the basic contract . . . .  It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document.") (citations and internal quotations omitted).

Having concluded that McKay agreed to arbitration, the Court next determines whether McKay's arbitration agreement is enforceable under Nevada law.

### c.  The McKay Arbitration Agreement is Valid and Enforceable

Of the various bases that may invalidate arbitration agreements, *see Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996), Plaintiffs argue that McKay's arbitration agreement is unconscionable.  Under Nevada law, "[g]enerally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a clause as unconscionable."  *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004) (per curiam) (internal quotation marks and ellipsis omitted).  "[L]ess evidence of substantive unconscionability is required in cases involving great procedural unconscionability."  *Id.* at 1162; *see also Burch v. Second Jud. Dist. Ct.*, 49 P.3d 647, 650 (Nev. 2002); *accord Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012).

###### i.       McKay's Agreement Is Procedurally Unconscionable

Procedural unconscionability exists "when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract,[7] or because the clause and its effects are not readily ascertainable upon a review of the contract." *D.R. Horton, Inc.*, 96 P.3d at 1162; *accord Gatton v. T-Mobile USA, Inc.*, 61 Cal. Rptr. 3d 344, 352-53 (Cal. Ct. App. 2007) (discussing contracts of adhesion). "Procedural unconscionability often involves the use of fine print or complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences." *Id.*; *accord Pinnacle Museum Tower Ass'n*, 282 P.3d at 1232. A party does "not have a duty to explain in detail each and every right that the [other party] would be waiving by agreeing to arbitration" to be enforceable, but "an arbitration clause must at least be conspicuous and clearly put [the other party] on notice that he or she is waiving important rights under Nevada law." *Id.* at 1164; *accord Madden v. Kaiser Found. Hosps.*, 552 P.2d 1178, 1185 (Cal. 1976).

The Court has reviewed the documents and pleadings on file in this matter and finds that the arbitration agreement between Citibank and McKay is a contract of adhesion. The agreement was a standard form using boiler-plate language drafted solely by Citibank. McKay had no opportunity or ability to negotiate the terms of the agreement or opt-out of the agreement. Further, the agreement was provided to McKay on a take-it-or-leave-it basis before McKay could electronically sign and submit his loan application. McKay could not apply for a student loan *unless* he agreed to arbitration in the form Citibank presented to him. Therefore, the Court finds that McKay's arbitration agreement is procedurally unconscionable.

---

[7] Under Nevada law, an adhesion contract is "a standardized contract form offered to consumers of goods and services essentially on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." *Kindred v. Second Jud. Dist. Ct.*, 996 P.2d 903, 907 (Nev. 2000).

1

### ii.    McKay's Agreement Is Not Substantively Unconscionable

2

3        The determination of substantive unconscionability focuses on the

4   one-sidedness of the terms in the arbitration agreement.  *D.R. Horton, Inc.*, 96 P.3d

5   at 1162-63; *see also Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1075 (9th Cir.

6   2007) ("Substantive unconscionability . . . focuses on the terms of the agreement and

7   whether those terms are so one-sided as to *shock the conscience*.") (emphasis in

8   original); *accord Pinnacle Museum Tower Ass'n*, 282 P.3d at 1232.  Generally, "the

9   agreement is unconscionable unless the arbitration remedy contains a 'modicum of

10  bilaterality.'"  *D.R. Horton*, 96 P.3d at 1165 (citing *Ting v. AT&T*, 319 F.3d 1126,

11  1148-49 (9th Cir. 2003); *accord Jones v. Humanscale Corp.*, 29 Cal. Rptr. 3d 881,

12  893 (Cal. Ct. App. 2005).

13       Of the three arguments Plaintiffs' collectively advance in favor the

14  unconscionability of their arbitration agreements, only one potentially applies to

15  McKay's agreement:  "Defendants' arbitration clauses expose creditholders to

16  expenses they would not be required to pay in litigation."  However, the McKay

17  arbitration agreement provides:

18       If you[8] file the arbitration, you will pay the initial filing fee.  If I file the
         arbitration, I will pay the initial filing fee unless I seek and qualify for a
19       fee waiver under the applicable rules of the Arbitration Administrator.
         You will reimburse me for the initial filing fee if I paid it and I prevail.
20       If there is a hearing, you will pay any fees of the arbitrator and
         Arbitration Administrator for the first day of that hearing.  All other fees
21       will be allocated in keeping with the rules of the Arbitration
         Administrator and applicable law.  However, you will advance or
22       reimburse filing fees and other fees if the Arbitration Administrator or
         arbitrator determines there is good reason for requiring you to do so, or I
23       ask you and you determine there is good cause for doing so.  Each party
         will bear the expense of that party's attorneys, experts, and [sic]
24       witnesses, and other expenses, regardless of which party prevails, except
         that the arbitrator shall apply any applicable law in determining whether
25       a party should recovery any or all expenses from another party.

26  [Doc. No. 16-5 at 19.]  Contrary to Plaintiffs' assertion that this provision forces

27  _____

28       [8] "You" refers to Citibank.  "I" and "me" refer to McKay.

McKay to pay "filing fee, the arbitrator's fees and costs, and the cost of Plaintiffs' own counsel, experts, witnesses, and other expenses, regardless of who prevails," this provision actually allows McKay to obtain fee waivers, shifts fees and costs to Citibank according to "applicable law," and does not force McKay to bear costs and fees that he otherwise would not have to pay if he litigated in court.  Moreover, there is no basis for Plaintiffs' assertion that McKay has "no chance . . . to receive his attorneys' fees, much less twice the fees (as in *Concepcion*), and where the arbitration clause does not allow the arbitrator to award costs or require the arbitrator to award damages or other relief pursuant to applicable law, even where a plaintiff successfully establishes liability."  The plain language of the McKay arbitration clause allows the arbitrator to award McKay all of the fees and costs when allowed by applicable law.  In other words, the McKay arbitration clause allows him to recover fees and costs in arbitration to the same extent as he could in court and further allows for the possibility of a filing fee waiver.  Consequently, the Court finds that the McKay arbitration agreement is not so "one-sided as to shock the conscience" that it is substantively unconscionable.

Because the Court finds that the McKay arbitration agreement is not both procedurally and substantively unconscionable, the Court concludes that the McKay arbitration agreement is valid and enforceable.

### 3. Plaintiff Baker's Arbitration Agreement

#### a. Choice of Law:  South Dakota Law Applies

The arbitration agreements at issue in Baker's "bill stuffer" notices designate South Dakota law as governing the agreements.  [Doc. No. 16-7 at 16, 42, 91, 120, 147, 175.]  As explained above, the Court first applies California's choice of law principles to the South Dakota law designation in Baker's arbitration agreements.  In the first step, the Court determines whether the chosen state–South Dakota–has a "substantial relationship" with either Citibank or Baker.  The Court finds that South

Dakota does bear a substantial relationship with Citibank because, as Plaintiffs allege in their First Amended Complaint, Citibank's primary place of business is in South Dakota.  [Doc. No. 3 at ¶ 11 ("Citibank is, and at all times mentioned herein was, chartered as a national bank, with its primary business address in South Dakota . . . .").]

The second step of the Court's choice of law analysis requires the Court to determine whether a conflict exists between the laws of South Dakota and California, and then whether South Dakota law is contrary to fundamental policy of California.  As will become evident below, because South Dakota law does not conflict with California law, the Court applies South Dakota law to Baker's arbitration agreements.

### b.    Baker Agreed to Arbitration

Citibank contends Baker assented to be bound by several revised cardmember agreements, which included arbitration agreements, when she continued to use her Thank You Card and Sears-branded accounts after she received the revised agreements and had the opportunity but failed to opt out of the new terms.  In response, Baker argues she did not agree to arbitration because her original 1997 GTE credit card application[9] did not contain an arbitration agreement.  She further argues that the "bill stuffer" notices that contained the complete terms of use for the Thank You Card account "cannot form the basis of any agreement to arbitrate because Ms. Baker . . . never clearly and knowingly assented to their terms."  [Doc. No. 20 at 15.]  The Court first considers the arbitration agreement associated with Baker's Thank You Card account and then considers the two agreements associated with her Sears card accounts.  In all three cases, the Court finds that Baker ostensibly agreed to arbitrate claims associated with her accounts when she

---

[9] Baker does not address the Sears card accounts and simply states they are not at issue in this litigation.  Defendants explain that all three accounts involve arbitration agreements and were delinquent when Defendants called Baker to collect her outstanding debt.

continued to use each credit account after receiving cardmember agreements.

As a general matter, a "bill stuffer" notice of change of terms is not an inherently invalid method of assenting to changes in credit card contracts, including the modification, addition, or deletion of terms. *See Guerrero v. Equifax Credit Info. Servs.*, 2012 U.S. Dist. LEXIS 150428 (C.D. Cal. Feb. 24, 2012) (compelling arbitration where Citibank's "bill stuffer" arbitration agreement complied with South Dakota law and was not contrary to California law); *Hoffman v. Citibank, N.A.*, 546 F.3d 1078, 1085 (9th Cir. 2008) (California law). As discussed below, under South Dakota law, an agreement to arbitrate exists between Baker and Defendants if Baker continued to use her credit account after she received the "bill stuffer" notices.

Baker did not opt out of the changed terms of services and continued to use her Thank You Card account. Baker contends her continued use of the account did not constitute assent to the arbitration agreement. However, under South Dakota law, such continued use of a credit account may constitute assent to arbitration. S.D. Codified Laws § 54-11-10; *Guerrero*, 2012 U.S. Dist. LEXIS 150428 at *18 ("Applying South Dakota law, the Court finds that Plaintiff entered into the arbitration agreement when he was mailed the 2001 Change-in-Terms, failed to take advantage of the opt-out provision, and continued to use the card."). Baker has not identified any contrary California law or policy, and the Court has not uncovered one. The Court concludes that Baker assented to arbitration when she continued to use her Thank You Card account after receiving change-of-terms notices and failed to opt out of the changed terms.[10]

---

[10]  Plaintiff Baker contends that "to [her] knowledge" she did not receive the change-of-terms notices. However, the mere assertion that she did not receive these documents is insufficient to establish this fact without additional evidence. *See Guerrero*, 2012 U.S. Dist. LEXIS 150428 at *20-21 (quoting *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.1995)). For example, she does not declare that the addresses on any of the notices were incorrect or that she had moved without notifying Citibank of her new address. Nor is there any evidence that the notices were returned as undeliverable by the postal service.

With respect to Baker's Sears accounts, Citibank provides fewer details. Citibank simply avers cardmember agreements were sent to Baker "when" she opened her account and that she assented to the cardmember agreements–and arbitration agreements therein–when she used her accounts after receiving the agreements.  Both exemplars of the Sears cardmember agreements notified Baker: "This Agreement is binding on you unless you close your account after 30 days of receiving the card and you have not used or authorized use of the card."  Under South Dakota law, because Baker used both cards after receiving the cardmember agreements, she assented to the arbitration agreements exists.  S.D. Codified Laws § 54-11-9 ("The use of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer with reference to any accepted credit card . . . ."); *see* Cal. Civ. Code § 1589; *Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (California law); *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 25 Cal. Rptr. 2d 242, 251 (Cal. Ct. App. 1993) ("As a general rule, silence or inaction does not constitute acceptance of an offer.  There are several well-recognized exceptions to this rule.  Acceptance of an offer may be inferred from inaction in the face of a duty to act . . . and from retention of the benefit offered.") (citations omitted).[11]

The cases Baker cites for the proposition that "[m]any cases hold that delivery of bill-stuffer documents does not constitute mutual assent," [Doc. No. 20 at 16], do not alter the Court's conclusion.  First, *Long v. Fidelity Water Sys.*, 2000 U.S. Dist. LEXIS 7827, at *10 (N.D. Cal. May 24, 2000), is unpersuasive for the reasons explained by the court in *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819, 833 n.12

_____

[11] Although South Dakota and California law do not appear to be in exact harmony, section 54-11-9 of the South Dakota Codified Laws does not conflict with California law, which does not appear to have such a focused statute.

1   (S.D. Miss. 2001).  Moreover, *Long* involved the implementation of an arbitration

2   clause *after* litigation had commenced.  *Long*, 2000 U.S. Dist. LEXIS 7827 at *8.

3       Plaintiff Baker also relies on *Badie v. Bank of America*, 79 Cal. Rptr. 2d 273

4   (1998), for the proposition that a unilateral addition of an arbitration clause under a

5   change-of-terms provision is unenforceable.  However, *Badie* did not hold that bill

6   stuffer notices are *per se* invalid.  Rather, the particular notice in that case failed to

7   provide consumers a "realistic opportunity to exit the account when the new terms

8   were added."  *Ackerberg v. Citicorp USA, Inc.*, ___ F. Supp. 2d ___, 2012 U.S. Dist.

9   LEXIS 149297, at *2, *10-11 (N.D. Cal. Oct. 16, 2012) (distinguishing *Badie* where

10  Citibank USA N.A.'s notice contained opt out provision and opportunity to pay off

11  outstanding balance under existing terms of card agreement).[12]

12      Having concluded that Baker agreed to arbitrate claims related to her Thank

13  You Card and Sears accounts, the Court now determines whether the arbitration

14  agreements are enforceable.

15  _____

16  [12] The facts in *Ackerberg* are nearly identical to the case at bar.  There, Citibank took over
    the plaintiff's account from another creditor, and the terms of the original agreement were not

17  known.  *Id.* at *1-2.  In 2003, Citibank sent the plaintiff a "bill stuffer" notice of change in terms
    that included an arbitration agreement and opt out provision.  *Id.* at *3.  The plaintiff continued to

18  use the card without opting out of the new terms.  *Id.* at *9.  The court distinguished *Badie* on its
    facts, found the plaintiff had assented to arbitration, and explained that "[n]umerous courts have

19  found that continued use or failure to opt out of a card account after the issuer provides a change in
    terms, including an arbitration agreement, evidences the cardholder's acceptance of those terms."

20  *Id.* at *10 (citing cases); *see also id.* at *9 ("The Court concludes that, regardless of whether the
    original agreement with Sears contained an arbitration provision, arbitration must be compelled

21  here.  Plaintiff could have opted out of her entire credit agreement with Citibank at or after
    November 2003, when Citibank issued a new agreement containing an arbitration clause and

22  opt-out opportunity, upon acquiring her account from Sears.  Instead, plaintiff accepted Citibank's
    terms through her subsequent use of the card.").

23      The Court has not found any California authority that is contrary to the above application
    of South Dakota law in *Ackerberg* and numerous other cases, and it appears California law is in

24  accord.  *See generally Citibank, N.A. v. Walker*, 2008 Cal. App. Unpub. LEXIS 7199, at *16-17
    (Cal. Ct. App. Sept. 11, 2008) ("Here, although the change was made in a 'bill stuffer,' [the

25  plaintiff] was given an opportunity to opt out of arbitration.  By opting out of the amendment, [the
    plaintiff] would have been permitted to use his card until it expired, at which time he would have

26  been able to pay off his balance under the existing terms.  This does not present the same take it or
    leave it scenario found to be procedurally unconscionable in [*Discover Bank v. Sup. Ct.*, 113 P.3d

27  1100 (Cal. 2005)].  Moreover, *Discover Bank* does not stand for the proposition that 'bill stuffer'
    amendments are *per se* unconscionable.  Rather, it focuses on the take it or leave it nature of the

28  contractual modification.").

### c.     Baker's Arbitration Agreements are Valid and Enforceable

With respect the enforceability of arbitration agreements, South Dakota law mirrors California law in that the existence of both procedural and substantive unconscionability are required to invalidate such provisions.  *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 194-95 (S.D. 2007); *accord Hoffman v. Citibank, N.A.*, 546 F.3d 1078, 1083 n.2 (9th Cir. 2008) (citing *Nygaard*). Because the Court finds that Baker's three arbitration agreements are not both procedurally and substantively unconscionable, the Court concludes that all three arbitration agreements are valid and enforceable.

### i.     The Thank You Card Agreement Is Not Procedurally Unconscionable; The Sears Card Agreements Are Procedurally Unconscionable

South Dakota law, like California law, first looks to the adhesive nature of a contract and next determines whether the weaker party had a meaningful opportunity to negotiate or opt out of the agreement.  *Nygaard*, N.W.2d at 195; *accord Hoffman v. Citibank, N.A.*, 546 F.3d at 1085 ("We have held that providing a 'meaningful opportunity to opt out' can preclude a finding of procedural unconscionability and render an arbitration provision enforceable.") (citations to California law omitted); *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 867 (Cal. Ct. App. 2002).

With respect to Baker's Thank You Card account, the 2003 Citibank notice of change in terms that converted Baker's GTE card and added the arbitration agreement informed her as follows:

> **Non-Acceptance Instructions:**
> If you do not wish to accept these changes to your card as described above, you must notify us in writing by July 23, 2003 stating your non-acceptance. . . . .  If you notify us by that time that you do not accept these changes, your account will be closed and you may pay off the balance of your account under the existing terms.  If you use your account on or after the effective date, you agree to these changes, even if you sent us a notice rejecting those changes.

[Doc. No. 16-7 at 3 (formatting in original).]  Moreover, in 2005, Citibank mailed a change in terms notice to Baker, removed one of the arbitration firms, and changed

the severability provision.  This notice contained the following opt out provision

**Right to Opt Out:**
To opt out of these changes, you must write us by April 30, 2005, indicating that you are opting out. . . . .  If you opt out of these changes, you may use your card(s) under the current terms until the end of your current membership year or the expiration date on your card(s), whichever is later.  At that time your account will be closed and you must repay the balance under the current terms.

[*Id.* at 29 (formatting in original).]  Baker was given a realistic opportunity to opt out of arbitration.  The opt out instructions allowed her to pay the remaining balance "under the existing terms" of the Thank You Card account and allowed her to continue using her account until it expired.  Thus, Baker would not have been required to pay the account's revolving balance on an accelerated, lump-sum basis if she chose to opt out of arbitration.  Based on these facts, the Court finds the arbitration agreement associated with the Thank You Card was not procedurally unconscionable.  *Accord Guerrero*, 2012 U.S. Dist. LEXIS 150428 at *15 (applying California law, which was not in conflict with South Dakota law).  Because the Court finds the Thank You Card arbitration agreement was not procedurally unconscionable, the Court's inquiry ends here.  Accordingly, because the agreement was not both procedurally and substantively unconscionable, the agreement is valid and enforceable.  The Court next considers the procedural unconscionability of the Sears agreements.

When contrasting the Thank You Card arbitration agreement to those associated with the Sears accounts, it is evident that both Sears arbitration agreements are procedurally unconscionable.  Both Sears cardmember agreements commanded Baker to close her accounts within 30 days of receipt of the cards if she did not wish to be bound by the terms of the agreements.  If she did not do so, she would be bound by the agreements and the arbitration agreements they contained.  This "take it or leave it" demand is inconsistent with Baker having a meaningful opportunity to negotiate or opt out.  *See generally Nygaard v. Sioux Valley Hosp. &*

*Health Sys.*, 731 N.W.2d 184, 195 (S.D. 2007) (procedural unconscionability means "how the contract was made (which includes whether there was a meaningful choice) . . . ."); *accord Hoffman*, 546 F.3d at 1084-85 (California Law); *Szetela*, 118 Cal. Rptr. 2d at 867 (same).  The Court next determines whether the Sears arbitration agreements were also substantively unconscionable.

### ii.    The Sears Agreements Are Not Substantively Unconscionable

In Plaintiffs' first substantive unconscionability argument that pertains to Baker, they argue:  "[I]f this Court holds that Defendants have unilaterally modified their contracts with Plaintiffs via bill stuffer, this unilateral power to modify the arbitration rules renders the arbitration agreement substantively unconscionable under California law."[13]  [Doc. No. 20 at 32.]  However, this argument does not apply to Baker's Sears accounts because Citibank did not amend the terms of an existing arbitration agreement using bill stuffer notices; Citibank did so only in relation to Baker's Thank You Card account.  To the extent Plaintiffs rely on provisions in Baker's Sears arbitration agreements that allow Defendants to modify the agreements in the future, the only two cases Plaintiffs cite are distinguishable employment cases.  *See generally L.A. Fitness Int'l LLC v. Harding*, 2009 U.S. Dist. LEXIS 110585, at *8-9 (W.D. Wash. Nov. 25, 2009) (explaining that such cases "deal with the unconscionability of modification clauses in the context of the employer attempting to modify the agreement in some way.").  Plaintiffs have not directed the Court to any authority that has found the inclusion of such provisions unconscionable outside the context of employment cases.  Moreover, both Sears

---

[13]  This argument applies only to Baker.  Neither of the arbitration agreements that relate to McKay and Cayanan involved "bill stuffer" notices.  For both McKay and Cayanan, Defendants rely on the original arbitration agreements McKay and Cayanan entered when they initially applied for their loans.  As for Baker, only the terms of the Thank You Card account were modified with bill stuffer notices.  The Sears cardmember agreements are exemplars of the original terms in effect when Baker applied for the cards.

agreements provide that future changes are subject to advance written notice and indicate that Citibank will provide Baker an opportunity to opt out.  [Doc. No. 16-7 at 142, 171.]

Baker next argues that her "arbitration clauses expose creditholders to expenses they would not be required to pay in litigation," including "filing fee, the arbitrator's fees and costs, and the cost of Plaintiffs' own counsel, experts, witnesses, and other expenses, regardless of who prevails."  [*Id.* at 33.]  However, the Sears account arbitration agreements are similar to McKay's agreement in that they allow shifting of costs and do not necessarily impose costs or fees that Baker would not incur in litigation.  The following excerpt from Baker's nearly identical agreements supports the Court's conclusion:

> **Who pays?**  Whoever files the arbitration pays the initial filing fee.  If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm.  If you have paid the initial filing fee and you prevail, we will reimburse you for that fee.  If there is a hearing, we will pay any fees of the arbitrator and arbitration firm for the first day of that hearing.  All other fees will be allocated as provided by the rules of he arbitration firm and applicable law.  However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for doing so.  Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

[Doc. No. 16-7 at 145-46 (formatting in original); *see also id.* at 174-75.]  For the reasons explained above in the Court's discussion of the substantially similar provision in McKay's arbitration agreement, the cost and fee provision in Baker's arbitration agreements is not substantively unconscionable.

### 4.   Plaintiff Cayanan's Arbitration Agreement

#### a.   Cayanan Agreed to Arbitration

Cayanan first argues that she never agreed to arbitration with any defendant.  However, the clear evidence before the Court–including Cayanan's own admissions–establishes that Cayanan signed two arbitration agreements when she

obtained two personal loans from CitiFinancial.

Although Cayanan avers that she does not remember signing the two arbitration agreements at issue, she states that "many papers were put in front of [her] when [she] took out the loan and [she] signed the papers where the Citibank loan representative told [her] to sign." [Cayanan Decl., Doc. No. 27-1 at ¶ 4.] The two arbitration agreements at issue are dated March 5, 2007, and January 18, 2008, and both dates match the corresponding executed Disclosure Statement, Note and Security Agreements. [Exs. 1-4 to Defs.' Mot., Doc. No. 16-3.] Although Cayanan states she does not remember signing the agreements, she does not present evidence that she in fact did not sign or receive the agreements when she signed the corresponding loan documents and further does not argue that the signatures are not hers–she only contends she does not *remember* signing the documents. *Cf. Carlson v. Global Client Solutions, LLC*, 2010 U.S. Dist. LEXIS 29255, at *6-7 (E.D. Wash. Mar. 4, 2010) (evidence in the record firmly established that the agreement to arbitrate was mailed to the plaintiffs after they had signed the loan agreement). In any event, "Plaintiffs acknowledge that Cayanan signed a contract with an arbitration agreement . . . ." [Doc. No. 27 at 2 n.1; *see also* Doc. No. 20 at 11 ("Ms. Cayanan entered into two identical signed Arbitration Agreements with Defendants.").] Under California law, a party can be bound by an arbitration clause even if she failed to read or understand it. *Bolanos v. Khalatian*, 283 Cal. Rptr. 209, 211 (Cal. Ct. App. 1991) ("When a person with the capacity of reading and understanding an instrument signs it, he may not, in the absence of fraud, coercion or excusable neglect, avoid its terms on the ground he failed to read it before signing it."). Therefore, the Court finds that Plaintiff Cayanan entered into two arbitration agreements on March 5, 2007, and January 18, 2008.

**b.      Cayanan's Arbitration Agreements Are Valid and Enforceable**

Under California law, an arbitration agreement, like any other contractual clause, is unenforceable if it is both procedurally and substantively unconscionable. *Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 983 (Cal. 2003).  California courts apply a "sliding scale" analysis in making this determination: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000). Although both procedural and substantive unconscionability must be present for the contract to be declared unenforceable, they need not be present to the same degree. *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Cal. Ct. App. 2003).  Thus, "even if the evidence of procedural unconscionability is slight, strong evidence of substantive unconscionability will tip the scale and render the arbitration provision unconscionable." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (en banc).

**i.      Cayanan's Agreements Are Procedurally Unconscionable**

"California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) (citing *Armendariz*, 6 P.3d at 690).  Here, because it does not appear Cayanan was given an opportunity to opt out of the arbitration agreements and her consent was apparently required to apply for the personal loans, at least some degree of procedural unconscionability exists.

ii.     **Cayanan's Agreements Are Not Substantively Unconscionable**

Substantive unconscionability focuses "on overly harsh or one-sided results," *Armendariz*, 6 P.3d at 690, and specifically on whether "terms of the agreement . . . shock the conscience." *Aron v. U-Haul Co. of Cal.*, 49 Cal. Rptr. 3d 555, 564 (Cal. Ct. App. 2006) (citations and internal quotations omitted).  "The phrases 'harsh,' 'oppressive,' and 'shock the conscience' are not synonymous with 'unreasonable.'" *Morris v. Redwood Empire Bancorp*, 27 Cal. Rptr. 3d 797, 809 (Cal. Ct. App. 2005). In the case of arbitration agreements, at least a "modicum of bilaterality" is required. *Armendariz*, 6 P.3d at 690.

As with Baker and McKay, Cayanan argues that "arbitration exposes [her] to expenses [she] would not be required to pay in litigation."  Cayanan's two arbitration agreements provide in part:

> **Costs.**  Unless the Rules of the Administrator allocation require allocation more beneficial to You,[14] the costs of any arbitration proceeding shall be divided as follows:
> * The party making demand upon the Administrator shall pay to the Administrator the filing fee required by the Rules when the demand is made, except that We will pay the amount of the filing fee in excess of the amount of the fees that would be required for You to file a lawsuit in Your jurisdiction.  In addition, We will pay to the Administrator all other administrative costs of the arbitration proceeding.  However, the arbitrator may award Us, in accordance with Rules, the excess amount of any such filing fee and any other arbitration administrative costs We incur if the arbitrator determines that the Claim was made in bad faith or lacks justification on Your part.  Despite our agreement to pay costs and fees described above, you have the option to pay Your share of filing fees and administrative costs consistent with the applicable Rules.
> * Each party shall pay his/her own attorney, expert, and witness fees and expenses, unless otherwise required by law or by other terms of the Note.

[Doc. No. 16-3 at 8, 15 (formatting in original).]  Like the McKay and Baker arbitration agreements, the Court finds the majority of this clause fairly allocates costs, fees, and expenses such that Cayanan would not be burdened in arbitration

---

[14]  "You" and "Your" refer to Cayanan.  "We" refers to CitiFinancial.

with costs, fees, and expenses she would not have to pay in litigation.  However, unlike the McKay and Baker agreements, the following provision is unconscionable and imposes one-sided costs on Cayanan:  "However, the arbitrator may award Us, in accordance with Rules, the excess amount of any such filing fee and any other arbitration administrative costs We incur if the arbitrator determines that the Claim was made in bad faith or lacks justification on Your part."  Having concluded that this provision is substantively unconscionable, the Court turns to whether it may be severed from the remainder of the agreement.

Under California law, "[t]hat the arbitration agreement contains . . . [a] flawed provision[] does not necessarily mean that the entire [agreement] is substantively unconscionable."  *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1084 (9th Cir. 2007) (citing Cal. Civ. Code § 1670.5(a)).[15]  "[A] court has discretion to either sever an unconscionable provision from an agreement, or refuse to enforce the agreement in its entirety."  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1005 (9th Cir. 2010).  "The question is whether the offending clause or clauses are merely 'collateral' to the main purpose of the arbitration agreement, or whether the [agreement] is 'permeated' by unconscionability."  *Davis*, 485 F.3d at 1084 (citing *Armendariz*, 6 P.3d at 696).  Here, although the isolated sentence above may unfairly allocate costs, fees, and expenses to Cayanan, the remainder of the agreement is not permeated by unconscionability.  The Court finds the unconscionable sentence above is collateral to the arbitration agreement at large.  Accordingly, the Court severs the sentence above from the agreement's "Costs" provision and finds the remainder of the agreement is enforceable.

---

[15]  Although the Ninth Circuit noted *Davis*'s abrogation on other grounds in *Kilgore v. KeyBank, N.A.*, 673 F.3d 947, 960 (9th Cir. 2012), the *Kilgore* opinion was vacated pending a hearing *en banc*, *Kilgore v. KeyBank Nat'l Ass'n*, 697 F.3d 1191, 1192 (9th Cir. 2012).

**5.      Plaintiffs' Agreements Allow For Vindication of Statutory Rights**

Plaintiffs also collectively argue that their arbitration agreements are unenforceable because the agreements prevent them from vindicating their statutory rights.  Without much explanation, Plaintiffs aver that their "arbitration clauses will preclude them from effectively vindicating their statutory rights as a *factual* matter because Defendants' arbitration clauses in particular so unfairly stack the deck against the consumer."  [Doc. No. 20 at 30 (emphasis in original).]  In Appendix A to their opposition brief, Plaintiffs identify six features of their arbitration agreements that ostensibly prevent them from vindicating their statutory rights as a factual matter.  However, the Court disagrees that these features prevent Plaintiffs from vindicating their statutory rights.

Plaintiffs assert that the following six aspects of their arbitration agreements prevent them from vindicating their statutory rights as a factual matter:[16]

- Plaintiffs' agreements do not allow for a communication or dispute resolution process before arbitration;

- A "Demand for Arbitration" form is not available on the internet;

- The locus of the arbitration proceedings shall be in the "[p]lace chosen by the arbitration firm in the same city as the U.S. District Court closest to customer's billing address, or at some other place to which both parties agree in writing;"[17]

- Defendants do not pay all of the arbitration claimants' costs;

- While the company in *Concepcion* was required to pay a minimum of $7,500 plus twice the claimant's attorneys' fees if the arbitration award was greater than the last written settlement offer, there is no

---

[16]  Plaintiffs seeks to distinguish *Concepcion* based on these six features to establish that their agreements do not contain the same "consumer friendly" provisions that the Supreme Court held allowed consumers to vindicate their statutory rights.

[17]  The Court does not discern any material difference between this provision and the one in *Concepcion*, which Plaintiffs state provided that the place of arbitration was to be "[i]n the county where [the] customer is billed."  Moreover, the arbitration agreements do not force Plaintiffs to arbitrate in a distant or inconvenient forum.  *See generally Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1292 (9th Cir. 2006) ("California courts have stricken arbitration provisions that would prevent the enforcement and vindication of public rights . . . by requiring arbitration in a distant and inconvenient forum.").

equivalent monetary incentive for Defendants to resolve the dispute; and

• Unlike in *Concepcion*, Defendants are not prohibited from seeking to recover attorneys' fees.

[App'x A to Oppo., Doc. No. 20 at 35.]  However, Plaintiffs have not explained how they are prevented from recovering under the TCPA as a result of any of these features of their arbitration agreements.  Nor can the Court decipher how these features prevent Plaintiffs from recovery as a "factual" matter, as none place limitations on their ability to garner or present facts and evidence to the arbitrator. Further, none of the arbitration agreements limit the type or amount of recovery the arbitrator may award Plaintiffs, and the agreements do not seek to abridge Plaintiffs' TCPA statutory rights.  Finally, while "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as [Plaintiffs] from effectively vindicating [their] federal statutory rights in the arbitral forum," *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000), no evidence exists in the record that Plaintiffs will bear any large costs–or any costs beyond the amount they would incur if they litigated in court.  *See generally id.* at 91 ("The 'risk' that [Plaintiffs] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.").  That Defendants will not pay *all* of Plaintiffs' arbitration fees, costs, and expenses is of no moment, and all of the arbitration agreements contain provisions that allow for fee-shifting in accordance with applicable law, fee waivers, or both.  *Cf. Nagrampa*, 469 F.3d at 1292 (noting a fee provision may be unenforceable where it requires the costs of arbitration to be borne equally between the parties and where it does not provide for fee-shifting pursuant to applicable law). Plaintiffs have not met their burden to show that arbitration is an unsuitable forum. *See Green Tree Fin. Corp.-Ala.*, 531 U.S. at 91.

12CV1476

1    **B.     Scope of the Arbitration Agreements**

2         Having determined that the arbitration agreements are enforceable, the only

3    remaining question is whether the arbitration agreements encompass the disputes at

4    issue here.  In light of "the strong federal policy favoring arbitral dispute resolution,"

5    *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999), and the specifics of

6    Plaintiffs' claims, the Court concludes that the agreements encompass Plaintiffs'

7    claims.

8         The scope of the claims governed by an arbitration clause depends on the

9    language used in the clause.  Most recently, in *Cape Flattery Ltd. v. Titan Maritime,*

10   *LLC*, 647 F.3d 914, 922 (9th Cir. 2011), the Ninth Circuit explained that arbitration

11   clauses using the phrases "arising under," "arising out of," and "arising hereunder"

12   have been "narrowly construed" to encompass disputes "relating to the interpretation

13   and performance of the contract itself," but that the inclusion of the phrase "relating

14   to" should lead to a broader interpretation.  *Accord Mediterranean Enters., Inc. v.*

15   *Ssangyong Corp.*, 708 F.2d 1458, 1463-64 (9th Cir. 1983) (explaining that omission

16   of "relating to" language in an arbitration clause results in a narrower scope of

17   covered disputes).

18        The plain language of Plaintiffs' arbitration agreements indicates that the

19   parties intended to agree to broad arbitration provisions.  Specifically, Cayanan's

20   agreements require arbitration of any "Claim," which includes, "without limitation,

21   *anything related to* . . . [a]ny dispute about closing, servicing, collecting, or

22   enforcing a Credit Transaction."  [Doc. No. 16-3 at 7, 14 (emphasis added).]

23   McKay's agreement requires him to arbitrate "Claims *relating to*:  1) any and all

24   aspects of my Account including without limitation the origination, establishment,

25   terms, treatment, operation, handling, billing, servicing, limitations on or termination

26   or acceleration of my Account . . . ."  [Doc. No. 16-5 at 18, 27 (emphasis added).]

27   Finally, Baker is required to arbitrate "[a]ll Claims *relating to* [her] account, a prior

28

related account, or [the parties'] relationship . . . ."  [Doc. No. 16-7 at 14, 40, 89, 117, 143, 172 (emphasis added).]  Defendants' arbitration agreements all contain the broad "related to" or "relating to" language, and the Court accordingly reads the clauses broadly.

Here, the predicate conduct for Plaintiffs' lawsuit "related to" the delinquent credit accounts held by Defendants.  It is undisputable that Defendants called all three Plaintiffs because Plaintiffs had failed to make timely payments on their accounts.  It is further undisputable that, once the accounts had become delinquent, Defendants called for the limited purpose of collecting money owed them.  Moreover, the calls were not made for advertising, marketing, or other purposes unrelated to the accounts.  In light of the broad language in all arbitration agreements and the narrow purpose for which Defendants contacted Plaintiffs, the Court concludes that the arbitration agreements encompass Plaintiffs' claims and Defendants' alleged conduct that form the basis for this action.

Plaintiffs contend their TCPA claims are outside the scope of the arbitration agreements because they are tort claims, not contract claims.  However, while TCPA claims are statutory tort claims, such claims are not inherently un-arbitrable and may be subject to arbitration.  *See, e.g.*, *McNamara v. Royal Bank of Scot. Grp., PLC*, 2012 U.S. Dist. LEXIS 158580, at *19-21 (S.D. Cal. Nov. 5, 2012) (compelling arbitration of TCPA claim); *Knutson v. Sirius XM Radio Inc.*, 2012 U.S. Dist. LEXIS 75698, at *8 (S.D. Cal. May 31, 2012) (same); *Gonzalez v. Citigroup, Inc.*, 2011 U.S. Dist. LEXIS 135421 (E.D. Cal. Nov. 22, 2011) (same).

Plaintiffs rely heavily on a case from this District, *In re Jiffy Lube International, Inc.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) (Miller, J.) ("*Jiffy Lube*"), in which the court denied a motion to compel arbitration of a TCPA claim.  In *Jiffy Lube*, the plaintiffs filed a class action complaint alleging that they received unauthorized text messages offering discounted Jiffy Lube services in violation of

the TCPA.  *Jiffy Lube*, 847 F. Supp. 2d at 1255-56.  The arbitration agreement at issue was purportedly signed by the plaintiff when he visited one of the defendant's store locations to receive an oil change.  *Id.* at 1262-63.  The court noted that the language of the arbitration agreement was "incredibly broad" because "[i]t purports to apply to 'any and all disputes' between [the parties], and is not limited to disputes arising from or related to the transaction or contract at issue."  *Id.* at 1262.  The court concluded that "a suit . . . regarding a tort action arising *from a completely separate incident* could not be forced into arbitration—such a clause would clearly be unconscionable."  *Id.* at 1263 (emphasis added).  To elaborate, the court further explained that "[t]hough it seems likely that [the plaintiff] provided his telephone number when signing the contract, it is unclear that later use of that number to commit a tort can be said to relate to the contract . . . .  [T]he fact that the text message offered membership in a club that would provide discounts on an oil change does not establish that the text message was related to the contract governing [the plaintiff's] oil change."  *Id.*

*Jiffy Lube* is distinguishable from the case at bar.  As Defendants aptly point out, *Jiffy Lube* "concerned TCPA claims resulting from marketing of future services, and was unrelated to the invoices for completed services in which plaintiffs had agreed to arbitration.  Here, in contrast, all of the calls made to Plaintiffs concerned the accounts they had already opened with Defendants and Plaintiffs' ongoing responsibility to make payments on those accounts."  [Doc. No. 26 at 26.]  Thus, while the predicate conduct in *Jiffy Lube* was separate and unrelated to the underlying contract, Defendants' alleged conduct in this case is directly related to Plaintiffs' accounts and the contracts that govern them.

/ / /

/ / /

/ / /

1

### IV.   CONCLUSION

2        Based on the foregoing, the Court **GRANTS** Defendants' motion to compel

3   arbitration of Plaintiffs' claims.  The Court **ORDERS** the parties to proceed to

4   arbitration in accordance with the terms of Plaintiffs' respective arbitration

5   agreements.  Finally, the Court **STAYS** this action pending completion of

6   arbitration.

7   **IT IS SO ORDERED.**

8   DATED:  February 28, 2013

9

10                                              Hon. Michael M. Anello
                                                United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28